

# Missouri Court of Appeals

## Southern District

### Division One

In re the Marriage of: )
)
AMY C. BESHERS (now Quinn), )
)
    Petitioner/Appellant/Cross-Respondent, )    Nos. SD32696 and SD32715
)           Consolidated
    vs. )    Filed: July 2, 2014
)
PAUL W. BESHERS, )
)
    Respondent/Respondent/Cross-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF WEBSTER COUNTY

#### Honorable Donald G. Cheever, Associate Circuit Judge

**AFFIRMED**

Amy C. Beshers Quinn ("Mother") and Paul W. Beshers ("Father") cross-appeal the trial court's February 7, 2013 "Amended Judgment and Decree of Modification." *See* Rules 81.04(c) and 84.04(i).[1] Mother's appeal (SD32696) and Father's appeal (SD32715) were consolidated for purposes of this opinion. On appeal, Mother raises five points of alleged trial court error, and Father raises a single point of alleged trial court error. Finding no merit in any of these points, we affirm the judgment of the trial court.

---

[1] References to rules are to Missouri Court Rules (2013).

## Factual and Procedural Background

In the light most favorable to the judgment, the following facts were adduced at trial. On August 13, 2009, a "Modified Judgment and Decree of Dissolution of Marriage" ("Dissolution Judgment") was entered dissolving the marriage of the parties and awarding the parties joint legal and physical custody of the three minor children born of the marriage: C.M.B., M.K.B., and C.J.B. (collectively "the children"), with Mother's address designated for mailing and educational purposes. Father was ordered to pay financial support to Mother for the children in the total amount of $545 per month.

On December 3, 2009, an altercation occurred between C.M.B., Mother, and Mother's current husband ("Quinn"), over an argument C.M.B. had with M.K.B. Mother spanked C.M.B. with a plastic cutting board, and Quinn then spanked C.M.B. with a wooden paddle. Each spanked C.M.B. numerous times resulting in both the plastic cutting board and the wooden paddle being broken.

On December 4, 2009, Father saw C.M.B. was badly bruised from his waist to the middle of his legs. The primary bruising was on his buttocks, both of which were severely bruised. Father immediately called the hotline for the Missouri Department of Social Services and was directed to take C.M.B. to the agency's office in Marshfield. Officer Todd Clark ("Officer Clark") of the Marshfield Police Department was contacted to take photographs of C.M.B.'s injuries.

C.M.B. was bruised to such an extent that Officer Clark recommended criminal charges be filed against Mother and Quinn. He prepared probable cause statements and provided those to the prosecuting attorney. Criminal charges were thereafter filed against Mother and Quinn;

however, the charges were dismissed after Mother signed a deferred prosecution agreement in which she admitted striking C.M.B.

Due to C.M.B.'s injuries, the Children's Division of the Missouri Department of Social Services implemented a safety plan wherein C.M.B. was placed with Father and had supervised visitation with Mother. C.M.B. has lived with Father since December 4, 2009.

On April 13, 2010, Father filed a "Motion to Modify Judgment of Dissolution of Marriage as to Child Support, Child Custody and Visitation." Father sought to have the Dissolution Judgment modified and asked the court to enter a new custody and support order in regard to the children. Father alleged that the children had undergone continuing and substantial changed circumstances, citing the December 3, 2009 spanking incident as support. Father's proposed parenting plan called for sole legal and physical custody of the children with supervised visitation for Mother. In her answer, Mother denied Father's allegations and requested the court refuse to modify the Dissolution Judgment as there were no substantial and continuing changes of circumstances.

On May 19, 2010, the court appointed Teresa Housholder ("Housholder") as guardian ad litem, a position she held until November 29, 2010, when the trial court granted her leave to withdraw. Kevin Easley ("Easley") was subsequently appointed to serve as guardian ad litem.

On June 4, 2010, the court entered a "Temporary Order" that C.M.B. would attend weekly counseling with Karon Harms ("Harms").

On December 16, 2010, Father filed a "Motion for Sanctions," alleging Mother had failed to pay her portion of the guardian ad litem fees to Housholder as ordered by the court, Mother had failed to pay her share of the counseling sessions with Harms as ordered by the court, and requested that Mother be sanctioned as a result. On March 28, 2011, the court heard argument

3

on Father's Motion for Sanctions. The court made the following docket entry: "Court hearing agreement [sic] on [Father]'s Motion for Sanctions and takes same under advisement." Thereafter, on September 28, 2011, Father filed a "Second Motion for Sanctions" with the same allegations as to Mother's nonpayment of fees.

On May 25, 2011, the court ordered Mother and Father to engage in "high-conflict resolution counseling" with John Duncan ("Duncan").

On January 25, 2012, Mother filed a "Counter-Motion to Modify Judgment of Dissolution of Marriage as to Child Support, Child Custody and Visitation." Mother alleged that there were changes in circumstances so substantial and continuing as to make the terms of the Dissolution Judgment unreasonable and that as a result, a modification was necessary to serve the best interests of the children.

A bench trial was held on February 1 through 3, 2012. Prior to trial, the trial court observed that leave had not been granted for Mother to file her counter-motion to modify and asked the parties whether there were any objections. Father's counsel did object stating that the motion was untimely (six days before trial) because Father would not have time to file any responsive pleadings, and that the relief sought by Mother was available as a part of Father's motion to modify. The trial court agreed with Father's counsel that "the relief requested is available to you already" and, on that basis, sustained Father's objection. Mother, however, did introduce evidence at trial supporting her counter-motion to modify, including her proposed parenting plan that provided she would have sole physical and sole legal custody of the children.

As relevant for purposes of this appeal, evidence was adduced at trial regarding the present state of C.M.B.'s relationship with Mother. Harms believed that C.M.B. was physically and emotionally afraid of Mother and that he would run away if ordered to live with her.

4

According to Harms, her sessions with C.M.B. and Mother became so combative that she had to suspend the sessions. During his testimony, C.M.B. confirmed that he wanted no contact with Mother even if arranged in a controlled setting. When C.M.B. was asked if he could tell some positive or good things about Mother as a parent, C.M.B. stated that, "I don't know any." C.M.B. testified he disliked Mother a lot and for all he cared "she could fall off the face of the earth and die and [he] wouldn't care." On one occasion, to avoid a scheduled visit with Mother, C.M.B. ran away from school.

At the conclusion of the evidence, the trial court took the case under advisement. On October 16, 2012, the trial court entered its "Judgment and Decree of Modification." Thereafter, on November 14, 2012, Father filed a "Motion to Amend Judgment and Motion for New Trial and Suggestions in Support Thereof." In this motion, Father argued that the trial court's judgment lacked written findings as to the factors listed in section 452.375.2, was incorrect as to the effective date of child support, and was incomplete and unenforceable by its terms with regard to a contempt order contained therein.

On February 7, 2013, the trial court entered its "Amended Judgment and Decree of Modification" ("Final Judgment"), which amended an earlier judgment pursuant to Father's November 14, 2012 Motion to Amend Judgment and Motion for New Trial and Suggestions in Support Thereof. Under the trial court's Final Judgment, the Dissolution Judgment was modified as it applied to C.M.B., but not modified as it applied to M.K.B. and C.J.B. The trial court found that the December 3, 2009[2] "spanking" or "beating" of C.M.B. by Mother and Quinn that left "significant bruising" on C.M.B.'s bottom and upper legs, resulted in significant issues between Mother and C.M.B. for which C.M.B. had been receiving counseling since the incident.

---

[2] The trial court's Final Judgment indicates the date of the spanking to be December **13**, 2009, which is a typographical error. The correct date was December **3**, 2009.

5

However, the trial court believed that but for Father's influence, Mother and C.M.B. could have reconciled and that the spanking by itself would not, in the trial court's opinion, justify a modification of the court's prior order. The trial court acknowledged the spanking had become a major source of friction between Mother and C.M.B. and helped shape C.M.B.'s feelings toward Mother.

The trial court further stated that Father had engaged in "frequent and deliberate attempts to alienate all the children toward [Mother]." While M.K.B. and C.J.B maintained a good relationship with Mother, C.M.B., as a result of the spanking incident and Father's attempts at alienation, had developed "an extremely bitter and unhealthy attitude toward [Mother]" and noted C.M.B.'s propensity to run away. Relying on Easley's written recommendations,[3] the trial court concluded that until some amount of reconciliation could be achieved between Mother and C.M.B., Mother having residential custody of C.M.B. is "at best, risky" and "has the potential for disaster." Additionally, the trial court was concerned that the conflict between C.M.B. and Mother would have an adverse affect on the other children, especially M.K.B.

The trial court concluded that both Father's proposed parenting plan and Mother's proposed parenting plan provided for custodial arrangements that were not in C.M.B's best interest. Therefore, the trial court rejected both plans and ordered the parties would have joint legal and physical custody of C.M.B., pursuant to the trial court's "Parenting Plan."

---

[3] In its Final Judgment, the trial court quoted the guardian ad litem as stating:

> I believe that if [C.M.B.] were ordered to return to the residential placement [with Mother], he would run from her placement which could potentially place him at risk of great harm. Because of [C.M.B.]'s predisposition to run, it is my recommendation that [C.M.B.] begin therapeutic visitation with [] Mother and therapist John Duncan.

While we cannot refer to the guardian ad litem's report as it was not filed with the record on appeal, we presume it to be consistent with the trial court's findings. *See In re J.M.*, 1 S.W.3d 599, 600 (Mo.App. S.D. 1999).

The trial court's Parenting Plan designated Father's address as C.M.B.'s address for mailing and educational purposes. Within ten days following the execution of the trial court's Final Judgment, C.M.B. and Mother were ordered to begin counseling with Duncan with "[s]ession frequency, and makeup of session to be determined by [Duncan] and shall continue until [Duncan] concludes no further sessions are necessary." Within sixty days, or sooner if determined by Duncan, Mother was to have unsupervised "visits" with C.M.B. on a schedule to be determined by Duncan. Thirty days after the initial unsupervised visit, Mother was to have eight overnight unsupervised "visits" from 6 p.m. on Fridays to 6 p.m. on Saturdays, to occur when M.K.B. and C.J.B were present. After the eight visits were completed, the "visits" would extend to 6 p.m. on Sundays. Mother also was to have seven consecutive days of unsupervised "visitation" with C.M.B. beginning the summer of 2013. Starting with Thanksgiving 2013, C.M.B. was to be on the same holiday schedule as M.K.B. and C.J.B. for Thanksgiving, Christmas, New Year's Day, Easter, Memorial Day, July 4th, and Labor Day.

The trial court's Parenting Plan further provided that "[n]either party shall have on their person or in their presence any recording device for the purpose of recording any conversation between themselves and [C.M.B.], nor shall either party allow any other party to record any conversation between themselves and [C.M.B.]."[4]

Additionally, the trial court ordered that Father's child support obligation for C.M.B. be terminated effective March 1, 2012, but no order was made for Mother to pay child support to Father for C.M.B. The trial court found that Father had not been forthright in his testimony and responses concerning his income.

---

[4] As acknowledged by Mother, and despite C.M.B.'s wishes, Mother has attempted to use a recording device during at least one scheduled visit with C.M.B. Mother further acknowledged that she has recorded telephone conversations between the children and Father.

7

The trial court also found that Mother had "intentionally and contumaciously" violated the court's orders in failing to pay fees she owed to Housholder and Harms and as a result, was in contempt. Mother could purge herself of contempt by paying $1,004.50 to Harms and $2,450 to Housholder in separate monthly installments of a least $50 per month until the balances were paid. The trial court further ordered that "[s]hould [Mother] fail to perform the acts as set forth above, she will be placed in the custody of the Sheriff of Webster County until such time as she has entirely purged herself of contempt."

In five points on appeal, Mother alleges that the trial court erred in: (1) transferring "residential custody" of C.M.B. from Mother to Father in that it rewarded Father for his successful attempt at alienation, and such transfer was contrary to the best interests of C.M.B.; (2) finding that there were substantial and continuing changed circumstances concerning C.M.B. because Father failed to prove the allegations in his motion to modify; (3) ordering that neither party shall have on their person or in their presence any recording device for the purpose of recording any conversation between themselves and C.M.B., nor shall have any other party recording any conversations because such an order may only be entered after a finding of impairment or endangerment of the minor child pursuant to section 452.400[5]; (4) finding that Mother intentionally and contumaciously violated the court's orders by failing to pay fees to Harms and Housholder because the court never ordered Mother to pay Harms' fees and Father was not the real party in interest and thus lacked standing to institute contempt proceedings; and (5) delegating to Duncan certain authorities because such was an unconstitutional delegation of the court's authority.

---

[5] All references to section 452.400 are to RSMo Cum.Supp. 2005.

8

In his cross-appeal, Father alleges the trial court erred in entering its judgment of modification because it erroneously modified the financial support to be paid on behalf of C.M.B. in that the trial court failed to accept or reject the calculations of the presumed correct child support amount as required by law.

The issues presented for our determination are:

1.    Can Mother argue on appeal that there was no change in circumstances?

2.    Was the trial court's best-interests finding erroneous?

3.    Is section 452.400 applicable here where both Mother and Father have joint physical custody of the children?

4.    Is the trial court's contempt judgment against Mother final and appealable?

5.    Did the trial court grant Duncan the authority to alter C.M.B.'s custody arrangement?

6.    Did Father properly preserve the trial court's alleged error in modifying the financial support to be paid on behalf of C.M.B.?

**Standard of Review**

As this is a court-tried case, review of this case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32. We view the evidence and all permissible inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Bridgeman v. Bridgeman*, 63 S.W.3d 686, 689 (Mo.App. E.D. 2002). "Substantial evidence is competent evidence from which the trial court could reasonably decide the case." *Bauer v. Bauer*, 38 S.W.3d 449, 455 (Mo.App. W.D. 2001).

"We presume the trial court reviewed all the evidence and awarded custody in view of the children's best interests." *Malawey v. Malawey*, 137 S.W.3d 518, 522 (Mo.App. E.D. 2004). The trial court is granted greater deference in a child custody matter than in other matters. *Id.* We presume the court's judgment is in accordance with the children's best interests after reviewing all of the evidence, and we will not reverse its decision unless we are firmly convinced that the welfare and best interests of the children require otherwise. *Id.* "An appellant seeking to reverse a trial court's ruling concerning custody of a child has to overcome a high standard of review." *Welch v. Welch*, 12 S.W.3d 712, 713 (Mo.App. S.D. 1999).

### Points I and II: Record Supports Judgment of Modification

In her first two points, Mother contends that the trial court erred in modifying the Dissolution Judgment with respect to C.M.B. The proper standard for modification of a joint physical custody judgment is found in section 452.410.1.[6] *Russell v. Russell*, 210 S.W.3d 191, 194 (Mo. banc 2007). Under section 452.410.1, a court may not modify a prior custody decree unless it finds, on the basis of facts which have arisen subsequent to that decree, that: "'(1) a change has occurred in the circumstances of the child or his custodian and (2) a modification of custody is in the best interests of the child.'" *Spire v. Adwell*, 36 S.W.3d 28, 31 (Mo.App. W.D. 2000) (quoting *Mobley v. Phillips*, 942 S.W.2d 399, 400–01 (Mo.App. W.D. 1997)). The burden of proof is on the party seeking modification to show the required change in circumstances. *Bather v. Bather*, 170 S.W.3d 487, 493 (Mo.App. W.D. 2005).

We first address Mother's second point on appeal in which she challenges the trial court's finding that "substantial and continuing changes in the circumstances" have arisen since the

---

[6] All references to section 452.410 are to RSMo 2000.

entry of the trial court's original custody order regarding C.M.B.[7]  Mother alleges that the trial court's finding was erroneous because Father failed to meet his burden to show the required change in circumstances.  In support, Mother notes that Father's motion to modify relied on the December 3, 2009 spanking incident to establish changed circumstances.  However, the trial court, as Mother notes, found that "[t]he spanking, by itself, would not, in this [c]ourt's opinion, justify a modification of this [c]ourt's prior order, as requested by [Father]."  Therefore, according to Mother, "there was no basis to modify the prior judgment and parenting plan[.]"

Mother is incorrect.  Our review is not limited to the specific allegations in Father's motion to modify.  *See Clayton v. Sarratt*, 387 S.W.3d 439, 447 (Mo.App. W.D. 2013).  Instead, to determine whether the trial court's judgment is supported by the record, we may look at all of the evidence that was presented.  *Id.*

We need not address, however, whether the record supports a finding of changed circumstances in this case.  "Both Father and Mother filed motions alleging that there had been a change in circumstances sufficient to justify a modification, and both parties presented evidence."  *Id.*  Though the trial court sustained Father's objection to Mother's counter-motion to modify as being untimely, the court agreed with counsel that the relief Mother sought was still available under the court's consideration of Father's motion.  Indeed, during trial Mother introduced evidence that included her suggested parenting plan seeking a modification of the

---

[7] Although the trial court found "substantial and continuing changes in the circumstances," a showing that the changes were "substantial and continuing" was not required in this case.  Here, the trial court modified C.M.B.'s address for educational and mailing purposes from Mother's address to Father's address and changed the parenting time schedule for C.M.B.  However, both Father and Mother retained joint legal and physical custody of C.M.B. under the trial court's modification.  Therefore, the trial court's modification changed the terms related to the custodial arrangement and not the custodial arrangement itself.  *See Clayton*, 387 S.W.3d at 445-46.  "[I]n order to modify the residential designation and the parenting time schedule, . . . the moving party must demonstrate a change in circumstances; the change, however, need not be substantial."  *Id.* at 446.  "Likewise, the change did not have to be 'continuing,' despite the language in the findings, because 'that is the standard for a modification of child support, not custody.'"  *Id.* at 447 n.18 (quoting *Hightower v. Myers*, 304 S.W.3d 727, 734 (Mo. banc 2010)).

11

Dissolution Judgment to award Mother sole legal and physical custody of the children.[8] Mother cannot now be heard to complain that there was no change in circumstances when she sought at trial a modification of custody. *See Bather*, 170 S.W.3d at 494; *see also Howsmon v. Howsmon*, 77 S.W.3d 752, 757 (Mo.App. S.D. 2002) ("'On appeal, a party is bound by the position he [or she] took in the circuit court and will not be heard on a different theory.'") (alteration in original) (quoting *In re Marriage of Medlock*, 749 S.W.2d 437, 440 (Mo.App. S.D. 1988)). Point II is denied.

We next address Mother's first point, which is premised on the trial court's finding that "[Father] has engaged in frequent and deliberate attempts to alienate all the children toward "[Mother,]" a finding which Mother does not dispute. Relying on this finding, Mother contends that the trial court's Parenting Plan was not in C.M.B.'s best interest for the reason that "transferring custody of the alienated child [(C.M.B)] to the alienator [(Father)], thereby reward[ed] [Father] for his successful attempts at alienation." Mother further argues that, because of Father's actions, she has suffered a "hardship" because she (the non-alienating parent) "now has restrictions imposed on her custodial time."

Mother's argument is flawed in that it incorrectly focuses on how the trial court's judgment affects her and Father. Our primary concern, however, is the best interests of the children. Contrary to Mother's apparent premise, although the trial court found that Father alienated C.M.B. from Mother, this does not equate to a mandate that modification in favor of Father is not in the best interests of C.M.B. or the other children. We have observed "that custody rights are not meted with a design to reward one parent or punish the other, that each

---

[8] Mother testified that she was seeking sole physical and legal custody of the children because she and Father were unable to co-parent because of a failure of communication. "In the context of joint custody, a breakdown of parental communication and cooperation is sufficient, in and of itself, to constitute a change in circumstances which can afford the basis for modifying a prior decree." *McCauley v. Schenkel*, 977 S.W.2d 45, 50 (Mo.App. E.D. 1998).

12

child custody case must be judged on its own facts and that parental rights are secondary to determining what will best serve the welfare of the children, which is always our primary concern." *Noland-Vance v. Vance*, 321 S.W.3d 398, 419-20 (Mo.App. S.D. 2010) (quoting *Garrett v. Garrett*, 464 S.W.2d 740, 743 (Mo.App. Spfld.D. 1971)); *see also Gentry v. Simmons*, 754 S.W.2d 579, 582 (Mo.App. W.D. 1988) ("The ultimate and sole test is what will be in the best interests of the child.").

Here, as required, the trial court determined the best interests of C.M.B. pursuant to section 452.375.2.[9] Further, the trial court explicitly noted that it "does not in any way want to reward [Father] for his actions[.]" However, the trial court stressed that "the alternative of forcing [C.M.B.] back into a custodial relationship with [Mother] and [Quinn] is, at best, risky." The trial court noted C.M.B.'s statements "that he hates [Mother]; that he would not care if she died; that he will not visit her; that if ordered to visit her, he will run away." In fact, as the trial court also observed, C.M.B. had already run away to avoid a scheduled supervised visit before

---

[9] All references to section 452.375 are to RSMo Cum.Supp. 2011. To determine a child's best interest, section 452.375.2 provides that a trial court shall consider all relevant factors including:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence as defined in section 455.010 has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and any other child or children for whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian. The fact that a parent sends his or her child or children to a home school, as defined in section 167.031, shall not be the sole factor that a court considers in determining custody of such child or children.

13

trial. The trial court accepted the recommendations of Easley and concluded that "[u]ntil such time as [C.M.B.] and [Mother], as the result of the passage of time, or extensive counseling and therapy, can achieve some amount of reconciliation, [Mother] having residential custody of [C.M.B.] has the potential for disaster." Additionally, the trial court expressed concern that the conflict between C.M.B. and Mother, as well as C.M.B.'s "attitude and outspoken behavior," would have an adverse affect on the other children, especially M.K.B.

"In determining parenting time, unless a court specifically finds otherwise, it is "the public policy in Missouri that frequent, continuing, and meaningful contact with both parents is in the best interest of the child and that any custody determination should further this policy." *Clayton*, 387 S.W.3d at 448 (quoting *Hightower v. Myers*, 304 S.W.3d 727, 735 (Mo. banc 2010)). Here, both parents retained joint physical custody of the children. Although under the trial court's Parenting Plan Father now has a greater percentage of parenting time with C.M.B. than does Mother, "there is no requirement that parenting time be equally divided between Mother and Father where they share joint physical and legal custody." *Id.*

In light of the foregoing, we are not convinced that the trial court's Parenting Plan is erroneous. Point I is denied.

### Point III: The Provisions of Section 452.400 are Inapplicable to This Case

In her third point, Mother contends that the trial court erred in ordering the following as part of its Parenting Plan: "Neither party shall have on their person or in their presence any recording device for the purpose of recording any conversation between themselves and [C.M.B.], nor shall either party allow any other party to record any conversation between themselves and [C.M.B.]." Because the trial court made no finding of impairment or

14

endangerment of C.M.B., Mother argues that the above-stated order violated section 452.400. We disagree.

Section 452.400.2(1) provides, *inter alia*:

The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his or her emotional development.

By its terms, section 452.400 only applies to "visitation." **Bell v. Bell**, 125 S.W.3d 899, 904 (Mo.App. W.D. 2004). Although the trial court characterized Mother's custodial time with C.M.B. as "visitation" such characterization was erroneous because, as already established, the trial court found "that the parties should exercise joint legal and joint physical custody of all the children pursuant to the [c]ourt's Parenting Plan[.]" "As a joint physical custodian, [Mother] does not have 'visitation,' which is provided only to non-custodial parents under the express terms of section 452.400.1."[10] *Id.*; *see also* **Loumiet v. Loumiet**, 103 S.W.3d 332, 337 (Mo.App. W.D. 2003) ("[W]here the parties are awarded joint physical custody, there is no visitation schedule, only a joint physical custody schedule[.]"). Therefore, section 452.400, which governs visitation, is inapplicable to the instant case. Point III is denied.

### Point IV: Contempt Appeal Not Reviewable

In her fourth point, Mother contends that the trial court erred in its finding "that [Mother] did in fact intentionally and contumaciously violate the orders of this [c]ourt by the failing to pay the fees of the former Guardian ad Litem, Teresa R. Housholder, Esq. and the counselor appointed for the children, Karon A. Harms, M.S., as ordered by this [c]ourt." Mother argues that this finding was erroneous because she was never ordered by the trial court to pay for

---

[10] The provisions of section 452.400.1(1) state "[a] parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his or her emotional development." For ease of discussion, we shall denominate the periods of time in which Mother has custody of C.M.B. as the trial court did in its Final Judgment.

counseling fees and Father "was not the real party in interest" and therefore "lacked standing to institute contempt proceedings."

Before addressing Mother's claims this Court must, *sua sponte*, determine whether Mother has presented an appealable judgment of contempt. *See **Jones v. Jones***, 296 S.W.3d 526, 528 (Mo.App. W.D. 2009). To be appealable, a civil contempt order must be final. ***In re Marriage of Crow and Gilmore***, 103 S.W.3d 778, 780 (Mo. banc 2003).

"Where a contempt order has the purpose of coercing a party to comply with a court order rather than punishing a party to protect, preserve, and vindicate the power and dignity of the court, the order is one for civil contempt." ***City of Pagedale v. Taylor***, 790 S.W.2d 516, 518 (Mo.App. E.D. 1990). Here, because the trial court's contempt order was issued for the purpose of compelling Mother to pay fees for services rendered by Housholder and Harms, the trial court found Mother in civil contempt.

"'A party held to be in civil contempt has two options: (1) purge [herself] of the contempt by complying with the court's order, making the case moot and unappealable; or (2) appeal the order, but only after the court's order is enforced by incarceration or otherwise.'" ***Bruns v. Bruns***, 186 S.W.3d 449, 452 (Mo.App. W.D. 2006) (quoting ***Lieurance v. Lieurance***, 111 S.W.3d 445, 446 (Mo.App. E.D. 2003)). A finding of contempt is interlocutory only and is not final for purposes of appeal until it is actually enforced. ***Jones***, 296 S.W.3d at 529. "Once a trial court has issued an order of commitment, then the contempt order 'changes from mere threat to "enforcement," and becomes final and appealable.'" ***Id.*** (quoting ***Gilmore***, 103 S.W.3d at 782).

In this case, the trial court ordered Mother to pay $1,004.50 to Harms and $2,450 to Housholder in separate monthly installments of a least $50 per month until the balances were

16

paid. The trial court further ordered that "[s]hould [Mother] fail to perform the acts as set forth above, she will be placed in the custody of the Sheriff of Webster County until such time as she has entirely purged herself of contempt." However, Mother does not assert, and the record does not contain, any indication that the above-stated order has been "enforced." *See id.* "Where, as in this case, there is no commitment order and no showing that the contemnor has ever been arrested, confined, or posted bond, the contempt order is interlocutory only and not appealable." *Id.* Mother's fourth point is premature and therefore is dismissed.

### Point V: Trial Court Did Not Impermissibly Delegate Authority

In her fifth point, Mother contends that the trial court's Parenting Plan was erroneous as a matter of law because the plan constituted an improper delegation of judicial authority to the counselor Duncan.

Mother cites a single case in support, *Aubuchon v. Hale*, 384 S.W.3d 217, 223 (Mo.App. E.D. 2012), which recognized that "[p]ermitting others to alter custody arrangements is an impermissible delegation of judicial authority." Under the facts in that case, such an impermissible delegation had occurred where a counselor was tasked with determining whether there was a normalization of the relationships of the parents and children and, if so, a prior parenting plan would be in full force and effect. *Id.* If the father failed to cooperate in the opinion of the counselor, he would have no contact with his children. *Id.* If the mother failed to cooperate in the opinion of the counselor, the prior parenting plan would go into effect. *Id.* The court stated in its decision that if the normalization process failed, which it might despite the best efforts of both parents, their only recourse was to file a motion to modify. *Id.* The *Aubuchon* court concluded that the trial court was "allowing a counselor to determine if there has been a

17

normalization of the relationships of the parents and children to trigger or deny continued custody arrangements." *Id.*

The instant case, however, is not analogous to *Aubuchon*. Here, the trial court's Parenting Plan provides that Mother and C.M.B. will begin counseling with Duncan within ten days of the Final Judgment. Counseling session frequency and duration shall be determined by Duncan and shall continue until he concludes no further sessions are necessary. Within sixty days of the first counseling visit, or sooner if Duncan determines Mother and C.M.B. are ready, Mother will have an unsupervised visit with C.M.B at such location and for such duration as Duncan shall determine. Additional unsupervised visits shall occur at such times as Duncan determines. Thirty days after the initial unsupervised visit, Mother will begin parenting time pursuant to the schedule laid out in the trial court's Parenting Plan.

As the foregoing makes clear, the trial court's Parenting Plan lays out a graduated schedule of contact between Mother and C.M.B. The plan allows Duncan some discretion to determine the frequency and duration of counseling sessions and initial unsupervised visits between Mother and C.M.B. However, unlike *Aubuchon*, the trial court's Parenting Plan does not rely on the occurrence or non-occurrence of an event to "trigger" or "deny" a custody arrangement. Whatever the outcome of Duncan's counseling, Mother will have joint legal and joint physical custody of C.M.B with a custody arrangement consisting of unsupervised visits with C.M.B. at her residence on a set schedule laid out in the trial court's Parenting Plan no later than 100 days following the trial court's Final Judgment. Because this custody arrangement is not subject to "alteration" by Duncan (or anyone else), no impermissible delegation of authority has occurred. Point IV is denied.

### *Father's Cross-Appeal: Allegations of Error as to Child Support Modification Not Preserved for Review*

Father asserts one point in his cross-appeal. He contends that the trial court erred in modifying the child support to be paid on behalf of C.M.B., "in that the trial court failed to accept or reject the calculations of the presumed correct child support amount made by [Mother] and [Father] or to determine its own calculation of the presumed correct child support amount as required by law." As argued by Father, these allegations of error relate to the trial court's failure to make findings required by Rule 88.01.[11]

However, Father's allegation of error was not raised in his November 14, 2012 Motion to Amend Judgment and Motion for New Trial and Suggestions in Support Thereof. Effective January 1, 2005, Rule 78.07(c) was amended to require an aggrieved party to file a motion to alter or amend the judgment specifically raising "'allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings' in order to preserve those claims of error for appellate review." *In re M.D.D., Jr.*, 219 S.W.3d 873, 875-76 (Mo.App. S.D. 2007) (quoting Rule 78.07(c)) (internal quotations and citations omitted). In *Crow v. Crow*, 300 S.W.3d 561, 566 (Mo.App. E.D. 2009), our Eastern District held that Rule 78.07(c) encompasses allegations of error that relate to a trial court's failure to make findings under Rule 88.01.[12] As such, "allegations of error relating to a failure to make findings required by Rule 88.01 in a court-tried case are not preserved for appeal and are thereby waived unless raised in a post-trial motion to amend the court's judgment pursuant to Rule 78.07(c)." *Id.*

---

[11] To comply with Rule 88.01, a trial court is required to: (1) determine and find for the record the presumed correct child support amount by using Form 14; and (2) make findings on the record to rebut the presumed correct child support amount if the court, after consideration of all relevant factors, determines that the amount is unjust and inappropriate. *Brooks v. Brooks*, 21 S.W.3d 834, 838 (Mo.App. E.D. 1999).

[12] In reaching its holding, the *Crow* court recognized that "Rule 88.01 has been adopted by the Missouri Supreme Court in compliance with a statutory mandate in section 452.340.8 that there be a rule in effect establishing child support guidelines." *Crow*, 300 S.W.3d at 566.

Accordingly, Father failed to preserve his allegations of error for review and the sole point in his cross-appeal is denied.

The Final Judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., C.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. - Concurs

DANIEL E. SCOTT, J. - Concurs